# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FIDELITY BROKERAGE SERVICES LLC,

Plaintiff,

v.

BRETT ROCINE, et al.,

Defendants.

Case No.  17-cv-4993-PJH

**ORDER GRANTING APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff's application for a temporary restraining order ("TRO") came on for hearing before this court on September 6, 2017.  Plaintiff appeared by its counsel Russell Beck and Ryan Erickson, and defendant Brett Rocine appeared by his counsel Andrew Hutchison and Leonard Weintraub.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the application as follows.

**BACKGROUND**

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") filed the complaint in this action on August 28, 2017, asserting two claims of misappropriation of trade secrets, plus claims of breach of contract, tortious interference with employment agreement, unjust enrichment, and injunctive relief, against defendants Brett Rocine ("Rocine") and J.P. Morgan Securities LLC ("JPMorgan").

Rocine worked as a Financial Consultant at Fidelity's Larkspur, California, office from October 2014 until July 20, 2017.  He now works at JPMorgan in its Mill Valley, California, office, as a Vice President, Private Client Advisor.  JPMorgan and Fidelity are

United States District Court
Northern District of California

1  direct competitors.  Complaint ("Cplt") ¶¶ 3, 4, 6; Declaration of Peter Van Bemmel in

2  support of TRO application ("Van Bemmel Decl.") ¶ 3.

3       Fidelity provides its customers a variety of financial services, including financial

4  planning, retirement services, wealth management, securities execution and clearing,

5  and life insurance services.  Cplt ¶ 19.  Unlike most other retail brokerage companies,

6  Fidelity does not have its Account Executives, including its Financial Consultants, make

7  "cold calls" to prospective customers who have no established relationship with Fidelity.

8  Cplt ¶ 20.

9       Instead, Fidelity requires its Financial Consultants to develop service relationships

10  based on leads that Fidelity provides, primarily prospective customers who have initiated

11  contact with Fidelity, or existing customers who have experienced a "triggering event"

12  such as a Fidelity 401(k) distributable event.  Cplt ¶¶ 20-22.  This lead-based approach to

13  supporting its Financial Consultants distinguishes Fidelity from other full-service

14  brokerages where individual brokers, rather than the firm, are responsible for establishing

15  customer relationships.  Cplt ¶ 23.

16       Fidelity requires each employee to execute a standard Fidelity Employee

17  Agreement in which the employee agrees not to use or disclose Fidelity's confidential

18  information, including customer information.  Cplt ¶ 7; Van Bemmel Decl. ¶¶ 8-9.  Rocine

19  signed the Employee Agreement at the inception of his employment in 2012.  Cplt ¶¶ 31-

20  34 & Exh. 1; Van Bemmel Decl. ¶ 8.

21       The Agreement defines "Confidential Information" as including "all information not

22  generally known to the public at the time made known to the Employee," which in turn

23  includes "trade secrets," "customer, prospect, vendor, and personnel lists," and "financial

24  and other personal information regarding customers and employees."  Cplt Exh. 1 at ¶ 1.

25  The Agreement also includes a "Non-solicitation" provision, which prohibits an employee

26  during his/her time of employment, and for one year thereafter, from using "Confidential

27  Information" to solicit any Fidelity client to move his/her business away from Fidelity.  Cplt

28  Exh. 1 ¶ 6.

United States District Court
Northern District of California

1    Mr. Van Bemmel, Rocine's former supervisor, met with Rocine before Rocine

2    departed from Fidelity on July 20, 2017, and reminded him of his obligation not to use or

3    disclose Fidelity's confidential customer information. Cplt ¶¶ 5, 38; Van Bemmel Decl.

4    ¶ 12.  In addition, on July 29, 2017, Fidelity sent Rocine a "separation letter," in which it

5    again reminded Rocine of his obligation not to use Fidelity's confidential information and

6    trade secret customer data, which Fidelity does not disclose to competitors and which it

7    protects using various safeguards.  Cplt ¶¶ 25-30, 40-41 & Exh. 5; Van Bemmel Decl.

8    ¶ 14.

9    Beginning in late July, Fidelity began receiving reports that Rocine had been

10   calling Fidelity's clients in an effort to divert their accounts to JPMorgan.  Cplt ¶ 43; Van

11   Bemmel Decl. ¶ 13; see also Declaration of Jess Perez ("Perez Decl.") ¶ 4.  Fidelity

12   asserts that Rocine has been using names and contact information he obtained while

13   working at Fidelity.  Cplt ¶ 43.

14   After Fidelity learned about this, it sent Rocine a cease-and-desist letter on August

15   7, 2017, reminding him he was not permitted to use Fidelity's confidential customer

16   information, including clients' names, addresses, telephone numbers, or account

17   information.  Cplt ¶¶ 8, 43 & Exh. 6; Van Bemmel Decl. ¶ 15.  Fidelity also requested that

18   Rocine return any confidential information in his possession.  Cplt ¶ 43; Van Bemmel

19   Decl. ¶ 15.

20   Although Rocine did not respond to the letter, JPMorgan did respond, by email on

21   August 9, 2017, advising Fidelity that Rocine was aware of his obligations, and stating

22   that "Mr. Rocine assures us that he did not retain a client list or any other confidential

23   documents or property from Fidelity."  Cplt ¶¶ 44, 45 & Exh. 7; Van Bemmel Decl. ¶ 16 &

24   Exh. 7.  Fidelity asserts, however, that notwithstanding JPMorgan's assurances, it has

25   received reports directly from its customers that Rocine has been soliciting them to

26   transfer their accounts to JPMorgan.  Cplt ¶ 46; Van Bemmel Decl. ¶¶ 17, 18.

27   According to Fidelity, over the period July 31, 2017, to August 22, 2017, at least

28   six different Fidelity clients reported that Rocine had contacted them and solicited them to

United States District Court
Northern District of California

1   move their accounts to JPMorgan.  Cplt ¶¶ 47-53 (citing reports by Fidelity customers

2   identified as "EC," "GP," "PS," "KM," "GN," and "AN"); see also Van Bemmel Decl. ¶¶ 20-

3   23 & Exhs. 7-8; Supp. Van Bemmel Decl. ¶ 3-7 & Exh. 1; Perez Decl. ¶¶ 5-11 & Exhs. 1-

4   6.  Fidelity contends that Rocine could not have known of the existence of these

5   customers unless he took confidential information with him when he left Fidelity.  Cplt

6   ¶ 54; Van Bemmel Decl. ¶¶ 13, 27.

7         Fidelity filed the complaint in the present action on August 28, 2017, asserting six

8   causes of action – misappropriation of trade secrets (under both the Defend Trade

9   Secrets Act of 2016 ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA")),

10  against both JPMorgan and Rocine; breach of contract, against Rocine; tortious

11  interference with employment agreement, against JPMorgan; unjust enrichment, against

12  Rocine; and injunctive relief, against both defendants.

13        Fidelity, JPMorgan, and Rocine are subject to the arbitration rules and regulations

14  of the Financial Industry Regulatory Authority ("FINRA"), pursuant to FINRA Rule 13200.

15  Cplt ¶ 11.  Although this dispute will ultimately be decided in binding arbitration before

16  FINRA, pursuant to FINRA Rule 13804, Fidelity is required to seek and obtain immediate

17  injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration

18  can proceed.  Cplt ¶ 11.

19        Fidelity asserts that once a restraining order is issued by this court, an expedited

20  arbitration can be scheduled with FINRA within 15 days of the entry of the TRO.  Cplt

21  ¶ 11.  If no TRO is issued, the FINRA arbitration cannot proceed on an expedited basis,

22  and will instead be assigned to a standard-track arbitration, which Fidelity contends might

23  not take place for a year or more.  Cplt ¶ 11.

### DISCUSSION

24

25  A.    Legal Standard

26        Federal Rule of Civil Procedure 65 provides federal courts with the authority to

27  issue temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65(a), (b).

28  Generally, the purpose of a preliminary injunction is to preserve the status quo and the

United States District Court
Northern District of California

1   rights of the parties until a final judgment on the merits can be rendered, see U.S. Philips

2   Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010), while the purpose of a

3   temporary restraining order is to preserve the status quo before a preliminary injunction

4   hearing may be held.  See Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto

5   Truck Drivers, 415 U.S. 423, 439 (1974)).

6       Requests for temporary restraining orders are governed by the same general legal

7   general standards that govern the issuance of a preliminary injunction.  See New Motor

8   Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1347 n.2 (1977); Stuhlbarg Int'l Sales

9   Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

10      An injunction is a matter of equitable discretion and is "an extraordinary remedy

11  that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

12  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); see also Munaf v. Geren,

13  553 U.S. 674, 689-90 (2008).  A preliminary injunction "should not be granted unless the

14  movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong,

15  520 U.S. 968, 972 (1997) (per curiam) (citation omitted).

16      A plaintiff seeking a preliminary injunction must establish that he is likely to

17  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

18  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

19  the public interest.  Winter, 555 U.S. at 20.  Alternatively, the plaintiff may demonstrate

20  that the likelihood of success is such that "serious questions going to the merits were

21  raised and that the balance of hardships tips sharply in the plaintiff's favor," so long as

22  the other two elements of the Winter test are met.  Alliance for Wild Rockies v. Cottrell,

23  632 F.3d 1127, 1131-32 (9th Cir. 2011).

24  B.      Fidelity's Application for a TRO

25      Fidelity seeks a TRO enjoining both JPMorgan and Brett Rocine from using,

26  disclosing, transmitting, and continuing to possess, for any purpose, including to solicit

27  any customer or prospective customer of Fidelity, the information contained in the

28  records of Fidelity, including but not limited to the names, addresses, telephone numbers,

1   email addresses, and confidential financial information of any customers Rocine learned

2   of through his employment with Fidelity.

3         Fidelity argues that it is entitled to injunctive relief because it can demonstrate

4   a likelihood of success on the merits, a likelihood of irreparable harm in the absence of

5   preliminary relief, that the balance of equities tips in its favor, and that an injunction is in

6   the public interest.

7         1.    Likelihood of success on the merits

8         Fidelity first contends that it has a strong likelihood of success on the merits,

9   because it has demonstrated that defendants misappropriated Fidelity's trade secret

10  information, and that Rocine breached the Employment Agreement by using Fidelity's

11  "Confidential Information" to solicit Fidelity's customers.  Fidelity cites to the declarations

12  and other evidence supporting its claim that Rocine repeatedly contacted his former

13  clients at Fidelity to solicit their business on behalf of JPMorgan.

14        In opposition, Rocine contends that he did not misappropriate any Fidelity

15  confidential or trade secret information.  He claims that he took nothing with him when he

16  left Fidelity – no client list, and no other documents or information, including contact

17  information, account numbers, account balances, or social security numbers.  Declaration

18  of Brett Rocine ("Rocine Decl.") ¶¶ 5-6.

19        Rocine asserts that after joining JPMorgan, he "made a list from memory of a

20  small number" of his former clients at Fidelity, because he wanted to inform them that he

21  had moved to JPMorgan, Rocine Decl. ¶ 9, which he contends is not an improper

22  solicitation.  He claims that the list contained approximately 25-30 names of his former

23  Fidelity clients (out of approximately 1,000 clients he serviced while he was at Fidelity).

24  Id.

25        Rocine claims that after creating this list (from memory), he searched the

26  JPMorgan computer system to try to obtain their contact information, in the event they

27  were also JPMorgan clients.  Id.  He asserts that "virtually all" the Fidelity clients he

28  looked up on the JPMorgan system also had "some type of account" at JPMorgan.  Id.

United States District Court
Northern District of California

1    For "the few" Fidelity clients who he did not locate in the JPMorgan system, he searched

2    publicly-available databases for those names, and was able to find contact information

3    (phone numbers) for all of them.  Id.

4        Rocine claims he then called the approximately 25-30 Fidelity customers to let

5    them know he had left Fidelity and was working at JPMorgan.  Rocine Decl. ¶ 10.  He

6    asserts that he spoke with only 15-20 of those former clients, and left voicemail

7    messages for the rest.  Id.  He contends that he did not initiate further calls to any of

8    those former clients if they did not contact him or ask him to call them.  Id.  He claims that

9    beyond those 25-30 former Fidelity clients, he has not contacted any of the remaining

10   approximately 1,000 clients he serviced while at Fidelity.  Rocine Decl. ¶ 11.

11       As for the allegations regarding the six Fidelity customers who allegedly claim that

12   Rocine contacted them repeatedly and tried to persuade them to move their accounts to

13   JPMorgan, Rocine denies that he left multiple messages or solicited any business.

14   Rocine Decl. ¶¶ 14-20.  He contends that he has a "strong relationship" with one of the

15   Fidelity clients that he contacted, and that that person has called him several times

16   wanting to know more about his new job at JPMorgan, and that the two of them had

17   lunch one time in August.  Rocine Decl. ¶ 18.

18       Rocine also argues as a general proposition that customer lists and general

19   customer information do not necessarily constitute trade secrets, because information is

20   not a trade secret when it is readily ascertainable through public sources.  His counsel

21   argued further at the hearing that Fidelity's customer lists cannot be protectable trade

22   secrets if, as provided in the Employment Agreement, a departing Fidelity employee is

23   barred from using such information to solicit business for only one year after leaving

24   his/her employment at Fidelity.

25       The court finds it unnecessary to determine whether the information regarding

26   Fidelity's customers constitutes trade secrets, because it finds that Fidelity has

27   established a likelihood of success on the merits as to the claim of breach of contract.

28   Rocine does not dispute that he is bound by the Employee Agreement, which prohibits

United States District Court
Northern District of California

1  him from using Fidelity's "Confidential Information" to solicit any Fidelity client to move

2  his/her business away from Fidelity for a period of one year following his departure from

3  Fidelity.

4      At the hearing, Rocine's counsel attempted to argue that nothing precludes Rocine

5  from soliciting his former Fidelity clients, and also asserted that he has not solicited

6  anything from any former client.  The court is persuaded, however, that the

7  contemporaneous notes of customer calls maintained by Fidelity, which are supported by

8  Mr. Perez's descriptions of his conversations with those customers, plus the recording of

9  the customer voice-mail which was played by Fidelity's counsel at the hearing, provide

10  sufficient support for Fidelity's claim that Rocine used Fidelity's "Confidential Information"

11  to solicit its customers.[1]

12      The court finds it disingenuous, at best, for Rocine to claim that he did not "use"

13  Fidelity's "Confidential Information" to solicit Fidelity's customers because all he did after

14  his departure was put together a list of customers "from memory" and then look up their

15  contact information in JPMorgan's account databases or in publicly-available databases.

16  The fact remains that he would not have known whose name to look up had he not first

17  obtained the names during the course of his employment at Fidelity.

18      2.    Irreparable harm

19      Next, Fidelity argues that it has established a likelihood of irreparable harm as a

20  result of defendants' wrongful and ongoing acts.  Fidelity claims that is has suffered and

21  is suffering irreparable harm through loss of both its confidential information (including

22  trade secrets) and its customer goodwill, even among customers who have declined

23  defendants' solicitations to transfer and/or who have reported being uncomfortable with

24

25     [1]   Rocine argues that the reports of customer calls are hearsay, and thus inadmissible.

26  In general, however, because of the urgency involved, and the limited time that TROs
remain in effect, declarations and evidence supporting an application for a TRO need not

27  conform to the standards for a summary judgment motion or the Federal Rules of
Evidence.  See Schwarzer, et al., Fed. Civ. P. Before Trial (2017 ed.) § 13:105 (citing

28  Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009); Flynt Distrib. Co., Inc. v.
Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984)).

1    Rocine's conduct and message.

2         Fidelity contends that defendants' theft and use of highly sensitive customer

3    information threatens to cause Fidelity customers to perceive that Fidelity does not

4    protect the security of their confidential financial information.  Fidelity cites to comments

5    made by some of the customers Rocine contacted, who reported, for example, that they

6    were concerned about the protection of their private financial information or that they

7    perceived Rocine's actions as "unprofessional."

8         In opposition, Rocine argues that Fidelity cannot demonstrate that it faces any

9    prospect of irreparable harm.  Rocine asserts that more than two months have passed

10   since his departure from Fidelity, without a single Fidelity client having moved his/her

11   account from Fidelity to JPMorgan.  See Rocine Decl. ¶ 12.  Thus, he argues, it is difficult

12   to tell what "irreparable harm" Fidelity will suffer if no injunction issues, and in particular, it

13   is unclear what "status quo" Fidelity is seeking to have altered by an injunction.

14        In addition, Rocine argues, a temporary loss of income, or any money damages, is

15   not sufficient to constitute "irreparable harm."  He contends that the threatened injury is

16   amenable to mathematically precise computation – for each customer that leaves Fidelity

17   for JPMorgan, the trade lost by Fidelity can be calculated.  Rocine argues that such

18   amounts cannot constitute irreparable harm.

19        The court finds that Fidelity has shown the likelihood of significant irreparable

20   harm if Rocine is not enjoined from using its client confidential information, at least until

21   the merits of Fidelity's claim have been resolved in the FINRA arbitration.  While Rocine

22   is correct that monetary injury alone is not "irreparable," see Sampson v. Murray, 415

23   U.S. 61, 90 (1974), Fidelity has also made a showing of a likelihood of harm that may be

24   truly irreparable.  For example, if Rocine continues to pursue business from his former

25   Fidelity clients, Fidelity will suffer harm to its reputation if it is perceived to have violated

26   or allowed the violation of its clients' confidential contact information.  See Stuhlbarg, 240

27   F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly

28   supports a finding of possible irreparable harm.").

United States District Court
Northern District of California

United States District Court
Northern District of California

3.  Balance of hardships and public interest

Finally, Fidelity argues that both the balance of equities and the public interest strongly favor granting the requested injunctive relief.  Fidelity claims that the benefit of injunctive relief far outweighs any detriment to defendants, as an injunction would protect Fidelity's valuable trade secrets, goodwill, business reputation, methods of business operations, and contract rights.  Fidelity asserts that any injunction would be focused on preventing defendants from using Fidelity's confidential information, and such an order would not cause significant hardship to defendants because it would only require them to comply with existing law.

In response, Rocine contends that balancing the risks of harm dictates denial of an injunction.  He claims that he would face a "profound injury" were an injunction to be issued – because an injunction would "effectively inhibit his clients from doing business with him" – and that by contrast, Fidelity will suffer no irreparable harm if an injunction is denied.

Fidelity also contends that the public interest will be served by granting injunctive relief, because without injunctive relief, individuals such as Rocine will be free to misappropriate their former employer's confidential information with impunity, and competing brokerage institutions will continue to recruit Fidelity employees who can share its confidential customer information.

In response, Rocine argues that issuance of an injunction would be "significantly injurious" to the public, because he has clients who wish to continue to do business with him.  He contends that the clear public interest in allowing individuals to continue to receive services of their established and trusted investment advisor mandates denial of plaintiff's request for injunctive relief.

The court finds that the balance of hardships and the public interest both favor the issuance of a TRO.  Rocine's argument is essentially that the issuance of a TRO will harm him because it will interfere with his ability to service those clients who might wish to transfer their accounts to JPMorgan.  However, nothing in the TRO precludes Rocine

United States District Court
Northern District of California

1   from sending his former clients a written announcement regarding his move to JPMorgan,

2   and nothing will preclude Fidelity customers from transferring their accounts to

3   JPMorgan.  What the TRO bars is the use by Rocine of Fidelity's customer information –

4   whether that information is stored in his brain or located elsewhere – to solicit customers

5   to transfer their accounts.

6                                          **CONCLUSION**

7          In accordance with the foregoing, the court hereby GRANTS Fidelity's application

8   for a TRO.  With regard to the question concerning the duration of the TRO, the court

9   notes that while a TRO issued without notice expires automatically within the time set in

10  the order, not to exceed 14 days, and may be extended for another 14 days "for good

11  cause" or by consent of both parties, Fed. R. Civ. P. 65(b)(2), there is no time limit or

12  other requirements clearly set in the Federal Rules for the court to set the hearing on the

13  motion for preliminary injunction where the TRO was issued with notice.  See Schwarzer,

14  et al., § 13:126.  Accordingly, the duration of the TRO will be 14 days, with an extension

15  of 14 days, or 28 days, to allow for the dispute to be submitted for arbitration.[2]

16         Within that 28 days, Fidelity must initiate the FINRA arbitration and determine

17  whether a motion for a preliminary injunction will be filed.  Given that a preliminary

18  injunction would, if granted, preliminarily adjudicate the merits of a dispute whose merits

19  will be decided in an arbitral forum rather than by this court, the court sees no utility in

20  scheduling a hearing for such a motion.  The parties shall meet and confer and advise

21  the court what if any further action they contemplate in this court.

22         The court ORDERS as follows:

23         1.     Effective immediately, defendants are enjoined from, either directly or

24  indirectly, and whether acting alone or in concert with others, using, disclosing,

25

26  _____
    [2]  Regardless of the fact that Rule 65 does not clearly address the duration of a TRO
27  issued with notice, the court finds, based on the nature of the relief provided, that a TRO
    cannot be extended indefinitely, even upon notice and hearing.  Thus the court issues the
28  TRO for the maximum duration specified under Rule 65(b)(2).  See Schwarzer, et al.,
    § 13:133.

1  transmitting, and continuing to possess for any purpose, including to solicit, induce, or

2  attempt to induce any customer or prospective customer of Fidelity, the information

3  contained in the records of Fidelity, including, but not limited to, the names, addresses,

4  telephone numbers, email addresses and confidential financial information of the

5  customers Rocine learned of through his employment with Fidelity;

6       2.     Defendants, and anyone acting in concert with them, including any agent,

7  employee, officer or representative of JPMorgan, or any other business for which Rocine

8  performs services, shall return to Fidelity all records, documents and/or information

9  pertaining to Fidelity customers, whether in electronic, handwritten or any other form

10  within five (5) days of entry of this order, including any and all copies.  This requirement

11  includes all records or documents, in any form, created by defendants, including

12  documents created from memory, or anyone acting in concert with them, based on

13  documents or information that was received or removed from Fidelity by Rocine;

14       3.     Rocine shall file a declaration attesting that he has returned to Fidelity all

15  information subject to this order within seven (7) days from the date of entry of the order;

16       4.     JPMorgan shall file a declaration attesting that it has returned to Fidelity all

17  information subject to this order within seven (7) days from the date of entry of the order;

18       5.     Pursuant to the requirements of sections 3 and 4 of the Federal Arbitration

19  Act, 9 U.S.C. §§ 3-4, the parties will proceed to an expedited arbitration hearing on the

20  merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the

21  FINRA Code of Arbitration Procedure;

22       6.     This order is effective immediately and does not require the posting of an

23  injunction bond.

24

25  **IT IS SO ORDERED.**

26  Dated:  September 7, 2017

27

28  _____
   PHYLLIS J. HAMILTON
   United States District Judge

United States District Court
Northern District of California

EXHIBIT B

Notice sent
10/26/2011
R. B.
B. R. R.
S. B. R.
S. N. S.
M. L. C.
R. C. R.
M. W.

**SUFFOLK SUPERIOR COURT**

*Ruling of the Court*

<u>**FIDELITY BROKERAGE SERVICES LLC,**</u>
**plaintiff**

<u>v.</u>                                                                              (sc)

<u>**BRIAN WILDER and MORGAN STANLEY SMITH BARNEY, LLC.,**</u>
**defendants**

3729

Case: SUCV2011-~~0329~~          Pleading #9: Plaintiff's Motion for Temporary Restraining Order
Date: October 25, 2011

Plaintiff Fidelity Brokerage Services, LLC (Fidelity) brings an action against its former broker, Brian Wilder, for breach of contract. Plaintiff also moves against Wilder's new employer, Morgan Stanley Smith Barney, LLC. (MSSB) for tortious interference with contract and 93A violations. Fidelity moves against both defendants for misappropriation of trade secrets.

Fidelity seeks a temporary restraining order against Wilder and MSSB to enjoin any violation of the non-solicitation agreements he signed in 1999 and 2003. Expedited arbitration is sought before FINRA. The temporary restraining order is **ALLOWED** without security in the terms requested by Fidelity.

### FACTUAL BACKGROUND

When asked to grant a preliminary injunction, the court initially evaluates the moving party's claim of injury and chance of success on the merits, based on submitted documents and a brief hearing; it is a preliminary determination. While not finding facts at this juncture, this court predicts that after trial, the following factual assertions will be found to be true.

Fidelity's market manager credibly asserts that the firm has a business plan which differs from other financial services organizations. It advertises to the public and presents its brokers with a book of business, rather than expecting them to develop their own customers. While Wilder denies the truth of this, it is more likely than not that Fidelity will be able to prove its unique marketing approach at trial.

At Fidelity, Wilder serviced households with more than $1 million in invested assets with the firm in the Private Client Group. The identity of such clients is valuable information to Fidelity and inaccessible except to certain Fidelity employees, i.e., Wilder. I believe that Fidelity has taken every step practicable to protect the identity of these clients.

Other financial service organizations have become signatories to the Protocol for Broker Recruiting, which has relaxed the standards regarding broker recruitment and free solicitation of former clients for brokers moving between certain firms. Fidelity is not one of them, hence the Protocol is largely immaterial.

Wilder went to Fidelity in 1999. In the employment agreement he signed that year, Wilder agreed that: "[d]uring my employment and for a period of one year following my separation from employment by the Fidelity Companies, I will not directly or indirectly, on my own behalf or an behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies...." Moreover, he acknowledged on April 14, 2003 that all "Fidelity customer information, including names, addresses, telephone numbers....is Fidelity Confidential Information."

On September 16, 2011, Wilder informed Fidelity that he was resigning his position as vice president senior account executive "effective immediately." He was verbally reminded of his obligations, which he acknowledged.

Wilder has denied in his affidavit that he removed any confidential or trade secret information from Fidelity. He has averred that he "left Fidelity only with the contact information of those clients whom I thought would be unhappy with me if they did not hear from me.... After I left Fidelity, I contacted some of my clients by telephone to inform them that I had left Fidelity, and that I was now working for MSSB....I did not encourage, persuade or solicit the clients I contacted to transfer their accounts to MSSB. Instead, I simply informed them of my departure and my new place of employment...."

And yet, over thirty customers have reported to Fidelity that Wilder has called them since he left the firm. On the day before he resigned, Wilder accessed internal computer data on thirty eight clients, in short bursts, without performing any transaction whatsoever. I find credible the Fidelity affidavits detailing Wilder's contacts with former clients because they name specific individuals (redacted), and provide specific details that can be corroborated. "Ms. H reported that Wilder told her he would be working with 75-100 clients at MSSB, rather than 500, so he would have more time to focus on them." Mr.L was asked by Wilder to move his $3 million in assets to MSSB. One of his former clients was very recently widowed, and Wilder called within a week of September 16 to transfer the widow's assets to MSSB. Four former clients received overnight packages as well as phone calls.

To the date of Wilder's affidavit, four clients had transferred to MSSB. This represents aggregate assets approximately $3.4 million. Further facts are referenced in the discussion below.

## DISCUSSION

The standard is familiar:

> [W]hen asked to grant a preliminary injunction, the judge initially evaluates in combination the moving party's claim of injury and chance of success on the merits. If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.... Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly

2

issue.  Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617(1980).

This court is satisfied that a non-solicitation agreement was signed by Wilder, that he was offered employment in consideration of that, and that he took contact information for certain of his Fidelity clients when he left its employ.  Moreover, Wilder has contacted these former clients since moving to Morgan Stanley, and several have moved with him        The defendants present their reasons why this motion should be denied.

### I: Wilder argues that contact information is not confidential.

In his brief, Wilder relies on Massachusetts unpublished precedent which values the client's right to the broker of his/her choosing over the concerns of the financial employers.  However, the confidentiality of customer contact information is entitled to protection under the law, Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 839 (1972), particularly where, as here, it has been made a matter of specific agreement and acknowledgement between the Fidelity and Wilder.  I am provided with many other decisions where trial courts have enforced the specific terms of Fidelity's agreement with Wilder.

The Protocol allows the taking of a client contacts from one employer to the next.  It is valueless against a non-signatory and so provides no protection to Wilder

### II.  Wilder denies soliciting his former clients.

Wilder complains bitterly that Fidelity has not referred inquiries to his desk at MSSB, to add weight to his position that he needed to announce his move to his clients.  However, he provided no information about his intentions in the letter to Fidelity terminating his employment.  He provided no forwarding address nor sought such consideration from Fidelity.  In fact, he invited Fidelity to address inquiries to his lawyer, who has appeared for him in this action.  I find his complaints unpersuasive.

Wilder asserts that he made telephonic announcement calls only, and did not solicit former clients.  Notwithstanding that claim, in short order, four clients transferred their accounts.

This court does not credit Wilder's affidavit, not only because it is contradicted thoroughly by the Fidelity affidavits, but chiefly because his communications with his former clients were verbal and thus, not preserved.  Had defendants chosen to use "wedding style" announcements, UBS Paine Webber v. Dowd, 2001 WL 1772856, and his clients nonetheless followed him, the outcome here might be different.

Moreover, MSSB is a signatory to the Protocol which, I am advised, represents the industry-wide standard; it permits the removal of client contact data and  free solicitation of former clients among signatory firms, of which one is MSSB.  Wilder avers that MSSB's practices are consistent with the Protocol.  I am asked to believe that in Wilder's case, MSSB engaged him, permitted him to take client contact information from Fidelity, and yet, did not encourage him to freely solicit his former clients, while new brokers from signatory firms were in their cubicles likely doing so.  I don't accept this.

I find it likely that Fidelity will prevail on the misappropriation of trade secret counts against both defendants at trial.

3

### III. The defendants claim there is no showing of irreparable injury.

Plaintiffs present a convincing picture of losing brokers and confidential client information in recent months to firms which are signatories to the protocol. Wilder is not an isolated case, and is likely part of a still-emerging pattern.

It is not sound to limit the injury here to the $3.4 million of transferred assets triggered by Wilder. It is impossible to predict the loss of business, trade secrets, and good will which this breach may trigger. One can never anticipate the future assets which might be owned by these very successful and wealthy families of the Private Client Group who are lost to Fidelity due Wilder's conduct.

While allowance of the TRO will burden these defendants, an expedited FINRA arbitration will start to resolve the issue within ten days. Moreover, it is apparent that MSSB willingly assumed the risk of such an outcome when they took on Wilder, and likely arranged for his representation by Mr. Thau, who has represented other MSSB brokers in identical circumstances.

### IV. Considerations of Public Interest

The public's interest and security is served by the protection of personal financial information. The enforcement of agreements entered knowingly is within the public interest. I see no harm to the public by allowance of this motion; FINRA 2140 prohibits interference with client choice, and the order makes no such interference. The public is not harmed by allowance of the order.

### CONCLUSION

For the foregoing reasons, Fidelity's Motion for a Temporary Restraining Order with out security is **ALLOWED**.

So ordered:

*Frances G. McIntyre*

Frances A. McIntyre

Justice, Superior Court

October 25, 2011

4



## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

|  |  |  |  |
|---|---|---|---|
| FIDELITY BROKERAGE SERVICES LLC | ) |  | Notice sent<br>10/26/2011<br>R. B. |
|  | ) |  | B. B. R. |
| Plaintiff, | ) | Civil Action | S. B. R. |
|  | ) |  | S. N. S. |
| v. | ) | No. 11- 37296 | M. L. C. |
|  | ) |  | R. C. R. |
| BRIAN WILDER, and MORGAN | ) |  | M. W. |
| STANLEY SMITH BARNEY, LLC, | ) |  |  |
|  | ) |  |  |
| Defendants. | ) |  |  |
|  | ) |  |  |

(sc)

### ~~PROPOSED~~ TEMPORARY RESTRAINING ORDER

This cause having come to be heard on the Motion of Plaintiff Fidelity Brokerage Services LLC for the entry of a temporary restraining order against Defendants Brian Wilder ("Wilder") and Morgan Stanley Smith Barney, LLC ("MSSB"), due notice having been given, and the Court having considered the written and/or oral arguments of all parties, the Court finds and orders as follows:

The Court finds that Fidelity has demonstrated a likelihood of success on the merits of its claims against Defendants, and that there is an immediate threat of irreparable harm to Fidelity for which no adequate remedy exists at law if the requested injunction is not entered. For those reasons, the Court hereby orders as follows:

1.     Effective immediately, Wilder and MSSB and anyone acting in concert with them are hereby restrained and enjoined from soliciting, whether directly or indirectly, and whether alone or in concert with others, any business from any customer or prospective customer of

Fidelity who Wilder served or whose name became known to Wilder while in the employ of Fidelity.

2.      Effective immediately, Wilder and MSSB and anyone acting in concert with them are hereby restrained and enjoined from using, disclosing, transmitting or continuing to possess for any purpose, the information contained in the records of Fidelity obtained from or as a result of Wilder, including, but not limited to, the names, addresses, and confidential financial information of Fidelity customers or prospective customers who Wilder served or whose name became known to Wilder while in the employ of Fidelity.

3.      Wilder and MSSB, and anyone acting in concert with them, are further ordered to return to Fidelity any and all records and/or documents in any form, received or removed from Fidelity by Wilder, containing information pertaining to customers or prospective customers of Fidelity who Wilder served or whose name became known to Wilder while in the employ of Fidelity, within five (5) days from the entry of this order, including any and all copies. This requirement includes all records or documents, in any form, created by Wilder, MSSB, or anyone acting in concert with them, based on documents or information that was received or removed from Fidelity by Wilder.

4.      Wilder and MSSB are further ordered to file declarations attesting that they have returned to Fidelity all information subject to this Court's Order within seven (7) days from the entry of the court's order.

5.      This Order excludes MSSB clients in existence as of the date of this Order.

6.      Pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§3-4, Wilder and MSSB are directed to proceed toward an expedited arbitration hearing

on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the Financial

Industry Regulatory Authority ("FINRA") Code of Arbitration Procedure.

7.    This Order shall remain in full force and effect pending arbitration on the merits

before the FINRA arbitration panel.

ENTERED _____

( McINTYRE        , J.)        Date  10·25·2011

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

FIDELITY BROKERAGE SERVICES LLC

Plaintiff,

v.

BRIAN WILDER, and MORGAN
STANLEY SMITH BARNEY, LLC,

Defendants.

Civil Action

No. 11- 3729 G

## FIDELITY'S MOTION FOR TEMPORARY RESTRAINING ORDER (WITHOUT SECURITY)

Pursuant to MASS. R. CIV. P. 65, Fidelity Brokerage Services LLC moves this Court for an immediate temporary restraining order (without security) against its former employee, Brian Wilder ("Wilder"), and his new employer, Morgan Stanley Smith Barney, LLC ("MSSB") (collectively, "Defendants"). Fidelity seeks this temporary restraining order to stop Defendants from continuing to misappropriate Fidelity's trade secret customer information, which Defendants are using in an attempt to illegally divert Fidelity customers to MSSB.

During his employment, Fidelity gave Wilder access to confidential personal and financial information for over 500 Fidelity customers with over $1 *billion* in assets under Fidelity management. Wilder and MSSB have been using that confidential information to unlawfully solicit Fidelity customers, and to otherwise misappropriate Fidelity's trade secret customer information for their benefit. Defendants' illegal conduct has already resulted in accounts with over $3.4 million in total assets being transferred from Fidelity to Defendants, and threatens Fidelity with further irreparable harm.

Notice sent
10/26/2011
R. B. R.
B. B. R.
S. B. S.
S. N. C.
M. L. R.
R. C. R.
M. W.

(sc)

1