# EXHIBIT A

## PROTOCOL FOR BROKER RECRUITING

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, <u>provided</u>, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding." The signatories to this protocol agree to implement and adhere to it in good faith.

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR. The local branch management will send the information to the firm's back office. In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose. If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s) and/or account information to the new firm before any such account number(s) or account information are provided.

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization. This information will be transmitted electronically or by fax, and the
requests will be processed by the central back office rather than the branch where the RR was employed. A client who wants to transfer his/her account need only sign an ACAT form.

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

The RR's former firm is required to preserve the documents associated with each account as required by SEC regulations or firm record retention requirements.

It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity.

Accounts subject to a services agreement for stock benefits management services between the firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm. Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement.

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit. In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving: (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations; (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership.

If accounts serviced by the departing RR were transferred to the departing RR pursuant to a retirement program that pays a retiring RR trailing commissions on the accounts in return for certain assistance provided by the retiring RR prior to his or her retirement in transitioning the accounts to the departing RR, the departing RR's ability to take Client Information related to those accounts and the departing RR's right to solicit those ac-

counts shall be governed by the terms of the contract between the retiring RR, the departing RR, and the firm with which both were affiliated.

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto. A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory. The protocol will remain in full force and effect with respect to those signatories who have not withdrawn.

Citigroup Global Markets Inc. ("Smith Barney")

By: _____
Name: Kevin McManus
Title: Managing Director and Chief Administrative Officer, Private Client Branch System

Merrill Lynch, Pierce, Fenner & Smith Incorporated

By: _____
Name: Phil Sieg
Title: Managing Director, Head of Strategic Leadership and Development

UBS Financial Services Inc.

By: _____
Name: Barry Buchsbaum
Title: Director of Strategic Development
Executive Vice President

- 3 -

# EXHIBIT B



Meredith A. Faro
Attorney

FMR LLC Legal Department
155 Seaport Blvd, ZW9A, Boston, MA 02110
Phone: (617) 392-8136  Fax: (617) 850-8335
Meredith.faro@fmr.com

December 6, 2018

**<u>Via Overnight Delivery</u>**

Harold A. Bridges
Bridges & Bridges
Attorneys At Law
318 Avenue I, #606
Redondo Beach, CA  90277

      *Re: James Buri*

Dear Mr. Bridges:

It has come to our attention that after James Buri left his position as Vice President, Financial Consultant in Fidelity Brokerage Services LLC's Newport Beach, CA Branch, he accepted a position with Morgan Stanley Wealth Management.

Fidelity has reason to believe that Mr. Buri may be contacting Fidelity customers for the purpose of soliciting their business.  The Employee Agreement ("the Agreement") he signed while in Fidelity's employ (copy attached) prohibits such solicitation of Fidelity's customers.  This letter constitutes a formal demand that any such activity cease immediately.  Furthermore, all of Fidelity's customer and prospect lists and all information concerning Fidelity's customers, including names, addresses, telephone numbers, email addresses and account information, are confidential and proprietary.  Pursuant to the Agreement and general principles of law, he is obligated to maintain all of Fidelity's confidential and proprietary information in strictest confidence.  This includes information that he has in his memory.  He may not disclose this information or make any use of it for himself or for others, including his present or future employers.

While California law permits Mr. Buri to announce his new employment, he is not permitted to retain Fidelity's information.  This letter constitutes a formal request that, on Mr. Buri's behalf, you return to Fidelity any Company Property, including but not limited to any and all records, electronic data, computer files, lists, screen prints, or computer discs pertaining to Fidelity clients or individuals or entities he became aware of through his employment at Fidelity, including but not limited to names, phone numbers, addresses and/or email addresses, whether in original, copied, computerized, handwritten or any other form.  To the extent these exist in electronic form, he must not delete it or alter it in any way, but instead must refrain from using it, accessing it or transferring it to anyone, and you must contact us to coordinate its preservation as evidence, and its return to us, in a forensically sound manner.  It is important to understand that deleting or

James Buri
Page 2

altering such electronically stored information without taking forensically sound steps to preserve it will be viewed as intentional destruction of evidence, and there can be serious sanctions that result from such destruction. Please have Mr. Buri verify that he has complied in full as set forth above by signing the enclosed affidavit and returning it to me.

Also, as a condition of Mr. Buri's employment with Fidelity, he was obligated to comply with Fidelity's Compliance Policy for Electronic Communications, Social Media and Systems Usage (the "Social Media Policy"). Pursuant to the Social Media Policy, he was strictly prohibited from connecting with any Fidelity clients on LinkedIn or any other similar networking platforms, unless he had a pre-existing personal relationship with that client from prior to his employment with Fidelity. If he has violated this policy by connecting with any Fidelity clients on LinkedIn or other networking platforms, then Fidelity demands that he delete any such connections and refrain from (a) initiating any communications with such client(s) through LinkedIn or any other similar platform's messaging function, and (b) updating his place of employment in a manner that will result in a notification being pushed out to such client(s), or which will be captured by a routine periodic push of updates to such client(s) through regular operation of LinkedIn or other platforms' systems. If he has updated his information since resigning or otherwise engaged in contacts or communications with Fidelity clients via LinkedIn or other similar platform, then he must take steps to preserve evidence prior to any deletion, consistent with the instructions set forth above.

Please be advised that if Fidelity does not hear from you by Friday, December 14, 2018, the company will pursue all necessary and appropriate remedies that it may have against Mr. Buri, which may include seeking monetary damages, injunctive relief, and/or its attorneys' fees and costs.

Further, he is hereby given notice of his obligation to preserve evidence that he knows, or should know, may be relevant to any potential lawsuit regarding the matters set forth in this letter. he should not destroy, conceal, or alter any evidence related to any claims or defenses regarding this matter, including without limitation any evidence in paper or electronic files, or other data generated by and/or stored on any smart phones or computers, including home computers and laptops, or contained in email, text message, or voicemail.

If you have any questions, please let me know.

Very truly yours,

Meredith A. Faro

Enclosures

## **AFFIDAVIT OF JAMES BURI**

JAMES BURI, being first duly sworn, states as follows:

1. My name is James Buri and I am over the age of 18. Except where otherwise indicated, the statements contained herein are based on my personal knowledge. I was employed by Fidelity Brokerage Services LLC ("Fidelity") until my employment ended effective November 30, 2018.

2. I hereby state that I do not have in my possession, custody or control customer lists (including any Christmas or holiday card or gift mailing lists), records, electronic data, computer files, or documents pertaining to Fidelity clients or prospective clients I worked with or became aware of through my employment at Fidelity, including but not limited to names, phone numbers, addresses and/or e-mail addresses, whether in original, copied, computerized, handwritten, photographed, maintained on an iPhone or iPad or other personal device, or any other form. This includes any documents created either during or after I left my employment with Fidelity that contain information pertaining to Fidelity clients or prospective clients that I worked with or became aware of through my employment at Fidelity, including information recreated through the use of memory, or by using information in memory to recreate information from public sources. To the extent I had any such information in hard copy, I have returned the hard copy documents to Meredith Faro, along with this affidavit. To the extent I had any such information in an electronically stored format, I or my counsel has engaged with Fidelity's counsel to arrange for forensically sound preservation, prior to removal, return to Fidelity and deletion from my possession, of any such electronically stored information.

3. I have not given any of the above documents or information or copies thereof to any other person or entity.

Pursuant to 28 USC §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____, 2018    _____
                                                                   James Buri

Sworn to and subscribed before me
this ____ day of _____, 2018

_____
Notary Public

Mandatory fields are marked with a red indicator.
**Employee Agreement**

# Employee Agreement

James Buri ("Employee") wishes to be employed by FMR LLC and/or any entity that is directly or indirectly, wholly or in part, owned or controlled by or under common control with FMR LLC (the "Fidelity Companies"). As a condition of employment, Employee and the Fidelity Companies agree to abide by this Agreement. This Agreement describes certain aspects of Employee's employment, protects Confidential Information and goodwill of the Fidelity Companies, and assists the Fidelity Companies in complying with their legal, regulatory, and other obligations.

1. Confidential Information. To assist Employee in the performance of his/her duties, the Fidelity Companies agree to provide to Employee training and/or education regarding the Fidelity Companies' business methods, and agree to provide to Employee access to certain Confidential Information belonging to the Fidelity Companies. Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customer, prospect, vendor, and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products; and information expressly designated as "Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. As a condition and in consideration of the Fidelity Companies' agreement to provide Employee with training and/or education and Confidential Information, Employee agrees that during his/her employment and thereafter, Employee will not copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information unless (1) necessary for Employee to carry out his/her job; (2) necessary for employees or other agents of the Fidelity Companies to carry out their duties and responsibilities; or (3) authorized in writing by the Fidelity Companies. Employee also will not retain any copies, notes, or excerpts of Confidential Information upon termination of his/her employment. Employee will promptly notify the Fidelity Companies of any inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Employee will not open, read, or in any way access Confidential Information without authorization. The foregoing requirements are subject to the limitations set forth in paragraph 10, below.

2. Systems Access. In order to carry out his/her responsibilities, Employee may be given access to various computer systems and passwords, user identifications, or other authenticating information ("password(s)"). Employee will not disclose his/her password(s) to anyone except in accordance with Fidelity policy. While incidental personal use of systems may occur, this is not the purpose of providing access; rather, all systems generally are to be used for legitimate Fidelity business purposes only, and all items created, accessed, or stored will be treated as Fidelity property for all purposes, including but not limited to monitoring, access, recording, review, and disclosure by Fidelity. Employee will adhere to all software licensing or other agreements applicable to systems and to Fidelity's expectations and policies regarding systems usage. Employee's authorization to access Fidelity systems shall expire when Employee leaves Fidelity's employ.

3. Company Property. Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information, or at any earlier time as requested by the Fidelity Companies, Employee will return all company property, including but not limited to his/her identification badge, company credit cards, company-owned equipment (such as cellular telephones, beepers, and laptop computers), and all documents and materials received from or created for or by any of the Fidelity Companies, including but not limited to Confidential Information.

4. Outside Business Activities. So long as Employee is employed by the Fidelity Companies, Employee will not engage in any other employment or business activities unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for outside activities may be withdrawn at any time.

5. Ethics and Outside Brokerage Accounts. So long as Employee is employed by the Fidelity Companies, Employee will adhere to the Code of Ethics for Personal Investing and the Statement of Policies and Procedures on Insider Trading and all other policies, procedures, or guidelines regarding Fidelity's standards for the proper conduct of business. If Employee is an employee of or associated with a registered broker-dealer or registered with the New York Stock Exchange or the Financial Industry Regulatory Authority, Employee will comply with industry agreements, standards, and regulations, and all special policies, compliance standards, and guidelines of the Fidelity Companies applicable to those in regulated businesses. Neither Employee nor Employee's spouse will maintain any brokerage account that either Employee or Employee's spouse owns or in which either Employee or Employee's spouse has a beneficial interest through any non-Fidelity broker-dealer unless Employee receives prior written approval from the Fidelity Companies in accordance with applicable policies and procedures. Approval for an outside account may be withdrawn at any time.

6. Non-solicitation. In consideration of the training and/or education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information, Employee agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies. During this same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies. Employee also will not, directly or indirectly, on his/her own behalf or on behalf of anyone or any company, hire, solicit in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies to leave his/her employment.

7. Inventions and Use of Name or Likeness. Employee will disclose and Employee hereby assigns to Fidelity as Fidelity's exclusive property all ideas, writings, inventions, products, methods, techniques, discoveries, improvements, and technical or business innovations (the "Inventions") that Employee makes or conceives, whether or not patentable or copyrightable, either solely or jointly with others, during the period of his/her employment. All written or computer coded materials manifested in documents, systems design, disks, tapes, drawings, reports, specifications, data, memoranda, or otherwise (the "Materials") made or conceived during Employee's employment shall be considered works made for hire, and all right, title, and interest in the Materials shall be owned by the Fidelity Companies. To the extent that the Materials may be held not to be works made for hire, Employee hereby assigns the sole right, title, and interest in the Materials to the Fidelity Companies. In addition, Employee will execute all necessary paperwork and provide all other reasonable assistance requested by any of the Fidelity Companies, either during his/her employment or thereafter, to enable the Fidelity Companies to obtain, maintain, or enforce in itself or its nominees, patents, copyrights, trademarks, or other legal protection on the Inventions in any and all countries. These provisions with respect to Inventions and Materials apply only to Inventions and Materials which (i) are along the lines of the business or work of any of the Fidelity Companies; (ii) result from or are suggested by any work which Employee does for the Fidelity Companies; (iii) are made or conceived using equipment or other materials of the Fidelity Companies; or (iv) are made or conceived during regular hours of work. These provisions do not apply to any invention that qualifies fully under the terms of California Labor Code Section 2870. In addition, Employee hereby authorizes the Fidelity Companies to use, publish, and copyright all or part of his/her name, voice, picture, portrait, and likeness as the Fidelity Companies may decide in their sole discretion, in all media and types of advertising for any product or service or for any other lawful purpose, without review by Employee.

8. Agreements with Others. Employee represents and warrants that his/her employment by the Fidelity Companies will not require Employee to violate any agreement Employee may have with any employer or other business, and that Employee will not engage in any activities in violation of any such agreement. Without limiting the foregoing, Employee will not use or disclose to the Fidelity Companies any confidential information belonging to others. Employee further represents and warrants that Employee is not a party to any agreement, and Employee owes no duty to anyone, that limits or affects his/her ability to perform his/her duties for the Fidelity Companies. Employee has attached to this Agreement a list of all confidentiality, inventions, non-solicitation, non-compete, or other restrictive agreements to which Employee is or has been a party.

9. At Will Employment. Employee's employment by the Fidelity Companies is at will and may be terminated by Employee or by the Fidelity Companies at any time and for any reason, with or without cause or notice, during or after any applicable initial evaluation period.

10. Communication with Government Entities: Nothing in this Agreement shall prohibit or restrict you from (A) communicating directly with, cooperating with, providing or causing to be provided information to, or otherwise assisting in an investigation by the Securities and Exchange Commission, FINRA, the Equal Employment Opportunity Commission, the Department of Justice, or any other government or regulatory agency, entity, or official or self-regulatory organization (collectively, "Government Authority") regarding a possible violation of any law, rule, or regulation; or (B) responding to any inquiry or legal process directed to you individually (and not directed to the Company and/or its subsidiaries) from any such Government Authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances. Nor does this Agreement require you to obtain prior authorization from the Company before engaging in any conduct described in this paragraph, or to notify the Company that you have engaged in any such conduct. However, in connection with any such activity, you acknowledge that you will take reasonable precautions to ensure that confidential information disclosed to any Government Authority is not made generally available to the public, including by informing the recipient of the confidential nature of the same.

11. **Miscellaneous.** This agreement will continue in full force and effect throughout Employee's tenure with any of the Fidelity Companies, regardless of any changes in Employee's responsibilities, the position Employee holds, or the particular Fidelity Company that employs Employee. Any agreement contrary to any of the provisions of this agreement or modifying this agreement in any way must be in writing and must be signed by the President or Human Resources Vice President of the Fidelity Company for which Employee works. Employee will disclose the existence and terms of this Agreement to any future employer of Employee. Employee's obligations under this Agreement shall survive the termination of Employee's employment with the Fidelity Companies. As to the provisions pertaining to Confidential Information, Employee's obligations shall continue until such time as the Confidential Information becomes known to the general public through no action on Employee's part. Any violation of this Agreement will cause irreparable damage to the Fidelity Companies or any of them. Therefore, the Fidelity Companies or any of them shall have the right to seek specific enforcement of this Agreement through equitable and injunctive relief, in addition to any other remedies available. This agreement will be for the benefit of the Fidelity Companies, its successors, and its assigns. The terms of this Agreement and any dispute out of it shall be governed by, and construed in accordance with, the laws of the state in which Employee currently is or, once Employee is no longer employed, was last, employed by Fidelity, without giving effect to such state's conflict of law principles. This Agreement is signed under seal.

**This agreement contains important information regarding the terms of Employee's employment with the Fidelity Companies. Employee and the Fidelity Companies hereby agree to adhere to it.**

\*
Candidate eSignature
\*\*\*\*\*\*

James
Buri

eSign Date
07/27/2016, 4:17:07 PM GMT

IP Address
192.223.242.21

*/s/ Tara N Amaral*

**Tara N. Amaral**

**SVP, Head of Talent Acquisition**

Updated 07/2016 Fidelity Highly Confidential Information

# EXHIBIT C

# *Bridges & Bridges*

318 Avenue I, #606 • Redondo Beach, California 90277

Harold A. ("Drew") Bridges • Phone: (310) 375-0434 • Facsimile: (626) 628-0465 • E-mail: drew@bridges-law.com

December 14, 2018

*Via E-mail (Meredith.faro@fmr.com)*

Meredith A. Faro, Attorney
FMR LLC Legal Department
155 Seaport Blvd. ZW9A
Boston, MA 02110

   *Re: James Buri*

Dear Ms. Faro:

   This will acknowledge receipt of your December 6 letter respecting James Buri's November 30 resignation from Fidelity Brokerage Services LLC ("Fidelity").

   Please know that in connection with resigning from Fidelity and joining Morgan Stanley Mr. Buri acted, and will continue to act, in accordance with California law and financial industry customs and standards. Moreover, your letter misstates the scope of Mr. Buri's rights as a California resident and former employee of Fidelity. Mr. Buri is entitled to immediately compete with Fidelity not merely "announce his new employment." As the California Court of Appeal yet again reaffirmed last month in *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, Case No. D071924 (November 1, 2018)[1] (*"AMN"*), Mr. Buri's right to transition between competitive employers in pursuit of his chosen profession is expressly protected by California *Business & Professions Code* §16600 ("Section 16600"). Section 16600 has been consistently so interpreted for more than a century by a legion of California appellate cases, including from the California Supreme Court. *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 945. Consistent therewith, the transition of California financial advisors from one firm to another occurs every day.

   As Mr. Buri's resignation letter confirmed, he left behind at Fidelity his Fidelity laptop, iPad, cell phone, electronic building pass, parking pass and assorted building and desk keys. He did not take nor possess any originals or copies of Fidelity proprietary documents. He did not take any Fidelity customer information. Public information is available to, and usable by, all. *AMN, supra, Slip Op.* p.12 ["... the use of non-trade secret information by a former employee was protected under section 16600.].

---

[1] A copy of the Slip Opinion is attached. Further citations are to the Slip Opinion (*Slip Op.*).

Next, Section 16600 is clear and unambiguous: *"every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."* (Emphasis added.). This statute, and the fundamental public policy it codifies, make no distinction based upon the characterization of the contract, policy or the nature of the restraint. *Silquero v. Creteguard, Inc.* (2010) 187, Cal App. 4th 60, 67-70. A host of California courts, including the California Supreme Court on multiple occasions, have made it clear that employers must view Section 16600 as an "addendum" to these types of restraints effectively adding the words "void in California." *Application Group, Inc. v. Hunter Group, Inc.,* (1998) 61 Cal App. 4th 881, 894.

For example, *Silguero* validated a public policy wrongful termination tort cause of action against an employer who terminated an employee who had signed a non-compete agreement with a former employer "out of respect and understanding with the colleagues in the same industry," notwithstanding the belief that "non-compete clauses are not legally enforceable here in California." The *Silguero* court did so expressly because of *"[S]ection 16600's legislative declaration of California's 'settled legislative policy in favor of open competition and employee mobility.'* [citing to] *Edwards v. Arthur Andersen LLP*, (2008) 44 Cal. 4th 937, 946." *Silguero, supra*, at 63.

*Silguero's* reliance upon the California Supreme Court's *Edwards* decision didn't end with the above reference. The *Silguero* court found and cited to the following references from the *Edwards* opinion as highly instructive:

*"In the years since its original enactment as Civil Code section 1673, our courts have consistently affirmed that **section 16600 evinces a settled legislative policy in favor of open competition and employee mobility [Citation.] The law protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.' [Citation.] It protects 'the important legal right of persons to engage in businesses and occupations of their choosing.'** [Citation.] (Edwards, supra, 44 Cal 4th at p. 946.) Indeed, **section 16600 'is unambiguous'** (Edwards, at p. 950.) and 'no reported California state court decision has endorsed the Ninth Circuit's [narrow restraint exception ...](Edwards, at p. 949.) Accordingly, **California courts' have been clear in their expression that section 16600 should not be diluted by judicial fiat.** [Citation..] (Edwards at pp. 949-950)]"* (Emphasis added.)

Accord, *AMN, supra; VL Systems, Inc. v. Unisen, Inc.* (2007) 152 Cal App. 4th 708 ["no-hire" agreement].

Indeed, *Silguero* expressly referenced the *VL Systems, Inc. v. Unisen, Inc., supra,* stating: *"The court in VLS "looked to the '**policies established by the cases which have found contractual provisions that restrict employment unenforceable'.**" Silguero, supra*, at 69. (Emphasis added.)

California jurisprudence respecting the breadth and scope of Section 16600 has been consistent for generations. Indeed, in California these are "Guiding Principles" *AMN, supra, Slip Op.* Pp 14-16; *see also, Diodes, Inc. v. Franzen,* (1968) *['the interests of the employee in his*

Case 8:18-cv-02246-JVS-ADS Document 7-7 Filed 12/19/18 Page 15 of 16 Page ID #:174

*mobility and betterment are deemed paramount to the competitive business interests of the employers"*, [260 Cal App 2d at 255]. *"If the interests of the employee trump the interests of the employer as a matter of public policy, then it logically follows that a broad-ranging contractual provision such as the one at issue here cannot stand." VL Systems, Inc. v. Unisen, Inc., supra,* at 714.

As referenced above, the line of authorities supporting Section 16600's application to Mr. Buri's situation are many and not limited to *AMN, Silguero, Diodes* and *VL Systems*; they include, without limitation: *Edwards v. Arthur Anderson, LLP* (2008) 44 Cal.4th 937, 942 [covenant not to compete preventing California accountant from performing services for clients at prior employer held void]; *Hill Medical Corp. v. Wycoff* (2001) 86 Cal.App.4th 895, 899-901 [employee "not obligated to refrain from competition" pursuant to Section 16600]; *Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 408 [non-compete covenant unenforceable against California resident]; *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859 ["California courts have consistently declared [Section 16600] an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice."]; *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 900-901 [the "interests of the employee in his own mobility and betterment are deemed paramount to the competitive interests of the employers."]. In fact, one's right to pursue their chosen business or profession is a property right that includes the right to engage in competition with a former employer. *Continental Car-Na-Var-Corp. v. Moseley* (1944) 24 Cal.2d 104, 110.

As a result, any contractual provisions that seek to restrain or prevent Mr. Buri, or any California employee, from proceeding to directly compete against Fidelity (however characterized and without regard to duration) are simply illegal and void pursuant to Section 16600. *See, e.g., Edwards, supra,* 44 Cal.4th at 948; *AMN, supra; Advanced Bionics Corporation v. Medtronic, Inc.* (2002) 29 Cal.4th 697; *Kolani, supra,* 64 Cal.App.4th at 407; *Application Group, supra,* 61 Cal.App.4th at 894. *Dowell v. Biosense Webster, Inc.* (2009) 179 Cal.App.4th 564, 576.

Fidelity is known to be aggressive in its efforts to stifle competition by its former financial advisors. In California, however, Mr. Buri's interest in his mobility and betterment trump any competitive business interests of Fidelity and its desired enforcement of its anti-competitive contractual provisions because they restrain, as a matter of fact, Mr. Buri's pursuit of his lawful profession, trade and business. *Application Group, Inc. v. Hunter Group, Inc., supra; AMN, supra* at 16 [broadly worded provision prevents individual defendants from either directly or indirectly soliciting or recruiting or causing others to solicit or induce any employee of AMN; provision clearly restrained individual defendants from practicing their chosen profession].

Fidelity should also be aware that attempted enforcement of void employment covenants violates California *Business & Professions Code* Section 17200 ("Section 17200") and constitutes an unfair business practice and unfair competition. Section 17200 prohibits unfair competition which is defined as "any unlawful, unfair or fraudulent business act or practice." In essence, Section 17200 borrows violations of other laws and treats them as unlawful practices independently actionable under Section 17200. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180. Thus, any attempt to enforce void restrictive

employment covenants against Mr. Buri constitutes unfair competition under Section 17200. *See, Application Group, Inc., supra* at 906-908 ["use of covenant not to compete in violation of Section 16600 [was] a violation of section 17200 as well."]; *Dowell, supra* at 575. Indeed, requiring a California employee to sign such an unlawful covenant as a condition of employment itself violates Section 17200. *D'Sa v. Playhut, Inc.* (2000) 85 Cal.App.4th 927, 933.

Further, as the *AMN* court affirmed, being required to defend against such unlawful and void restraints seeking to prevent California residents from practicing their chosen profession vindicates an important legal right and supports an award of attorneys' fees under *Code of Civil Procedure* section 1021.5. *AMN, supra* at 42-45.

In these connections, Mr. Buri reserves all his rights.

To reiterate, as stated in Mr. Buri's resignation letter, he did not take any confidential or proprietary Fidelity documents. He has nothing to identify nor return. Upon joining Morgan Stanley Mr. Buri has acted, and rest assured will continue to act, in accordance with California law.

Yours very truly,

Harold A. (Drew) Bridges
Of Bridges & Bridges

ec:   James Buri